SOUTH PORTO RICO SUGAR COMPANY, Petitioner, *v.*
SUGAR BOARD OF PUERTO RICO, Respondent.

No. 35. Submitted May 1, 1960.—Decided April 19, 1961.

*James R. Beverley, R. Castro Fernández* and *Francisco Castro Amy* for petitioner. *Alejandro Romanacce* for respondent.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

We have before us, once more, a controversy arising from the application of § 6 of the Sugar Act [1] (5 L.P.R.A. § 375)

---

[1] "The following terms and conditions shall govern the transportation and hauling of the *colono's* cane:

"(a) The central may provide means for the transportation of its *colono's* cane from the *colono's* farms to the central, and when such means is so provided, the central shall pay to the *colono* seven and one-half (7 ½) cents on each ton of cane delivered, as compensation for hauling expenses; *Provided,* That if during the grinding season of 1950 any central has paid a higher amount for such expenses, the latter shall be the governing rate for said central. In case the central does not provide such means of transportation, it shall be bound to compensate the *colono* in the manner and to the extent hereinafter established, for the transportation of said cane from the *colono's* farm to the point of

and particularly from the provision that grants the sugar mills the power to designate the place in which the colonos shall deliver their sugar canes. Essentially, this is a dispute on the facts. The Sugar Board, after the proper proceedings, made the following findings:

"From the evidence submitted to the Board, the transportation and hauling system used by the Central Guánica, during their grinding seasons of 1954, 1955 and 1956, consisted of receiving the sugar cane from its colonos in the following manner: (1) in the colonos' farms, the Central furnished the means of transportation from the colono's farm to the sugar mill; (2) in sidetracks located less than half a kilometer from the normal or natural exit of the colono's farm, the colono furnishing the means of transportation up to the sidetrack, transferring there the canes to a public or private railway owned by the Central Guánica; (3) to receive canes at sidetracks, located half a kilometer or more from the normal or natural exit of the colono's farm, the means of transportation, up to the sidetrack, being furnished by the colono, and transferring there the canes to a public or private railway, and

---

delivery designated by the central, whether such transportation is made with equipment belonging to the *colono* or leased by him. The central shall be bound to provide gratuitously to all its *colonos* hoisting service and the necessary personnel for the operation thereof at each point designated by the central for the delivery of cane. In the case of a new *colono*, or one who desires to change the point of delivery of the cane, and the central and the *colono* do not reach an understanding as to the point of delivery, the Board shall determine the point where the central shall receive the cane of the *colono* from among the ones designated by the central.

"(b) In those cases where the *colono* transports his cane, the central shall compensate him at the basic rate of fifteen (15) cents for each ton of cane transported, as hauling expenses, plus the sum of five (5) cents for each ton per kilometer, from the farm to the point of delivery, provided the distance to be covered from the farm to the point of delivery is one-half kilometer or more; *Provided*, That the *colono* shall be entitled to receive the basic compensation of fifteen (15) cents even if the distance to be covered from the farm to the point of delivery is less than one-half kilometer. For the purposes of this compensation, the distance shall be determined from the normal or natural exit in the *colono's* farm where the cane was cut, to the point of delivery designated by the central. If upon determining the weight and the distance in the transportation and hauling of the cane, there results a fraction of a kilometer or of a ton, a proportional compensation shall in both cases be paid for such fraction.

(4) to receive canes in the Central's *batey*, such canes being transported by the colono in trucks owned or leased by him.

"It was proved, from the testimony of all the colonos that were present at the hearings, that the Central Guánica did not make any change in its system of receiving and transporting canes and that as in the grinding seasons of 1952 and 1953, it continued using for the grinding seasons of 1954, 1955 and 1956, the same place of delivery for receiving the cane designated to them at the different sidetracks from time immemorial and transporting said canes from the sidetracks to the Central's *batey* by means of a public railway known as the Porto Rico Railroad and Transport Co. and by the private railway owned by the Central, the Central Guánica being in control of the delivery of the canes to the colonos at those sidetracks and of the movement of the loading wagons of both railways, and paying, with no extra charge to the colono, the freight on the colonos' canes, from those sidetracks to the Central's *batey*.

"  .     .     .     .     .     .     .     .

"But even though, from all the evidence submitted, it is clear that the Central Guánica continued receiving the colonos' canes in the same places it had received them from time immemorial, and in the same places it had received them during the grinding seasons of 1952 and 1953 and paid its colonos compensation for transportation and hauling and hoisting

---

"(c) In those cases where portable tracks have been used by the central for the transportation of a *colono's* cane, the central shall be bound to furnish to the *colono*, without any cost whatsoever to the *colono*, the said portable tracks and the necessary rolling material; and it shall also be bound to pay to the *colono*, as hauling expenses, five (5) cents for each ton of cane. The central may discontinue the practice of furnishing to its *colonos*, either directly or through any subsidiary entity, agent or contractor, portable tracks, provided it obtains the approval of the Board to do so. The Board shall be empowered to order any central to discontinue the use of any transportation system which, in the judgment of the Board, may be prejudicial to the interests of the *colonos* or of the industry.

"(d) The compensation hereinabove provided for transportation and hauling, shall be paid weekly by the central.

"(e) The centrals shall be liable to the *colonos* for the cane of the latter from the time it is received by them at the point of delivery designated by the central, except in cases of force majeure, or for reasons beyond the control of the central.

"In no case shall the central be under obligation to pay more than one dollar for transportation and hauling."

.     .     .     .     .     .     .     .

services required by the aforesaid § 6, Central Guánica refuses to pay to its colonos such legal compensation during the grinding seasons of 1954, 1955 and 1956 under the legal pretense that it had changed the system of hauling and transportation of canes because, since 1954, the Central acted as an agent of the colono in transporting his canes by public railway to the Central's *batey*. . . .

". . . . [Central Guánica] executed, (A) 595 contract-letters with its colonos for the grinding seasons of 1954, 1955 and 1956, designating the Central's *batey* as the point of delivery, but without mentioning the so-called clause of agency with the Porto Rico Railroad Co.; (B) Nine contract-letters designating the Central's *batey* as the delivery place, including the so-called clause of agency of the Porto Rico Railroad Co.; (C) Twenty-two contract-letters designating certain sidetracks as delivery places, including the so-called clause of agency of Porto Rico Railroad Co.; (C-1) Six contract-letters designating certain sidetracks as delivery points excluding the agency clause of the Porto Rico Railroad Co.; (C-2) nine deeds designating certain sidetracks as delivery points, excluding the so-called clause of agency of the Porto Rico Railroad Co.; (D) Nineteen contract-letters designating the *batey* as delivery point and including the agency clause of the Porto Rico Railroad Co.; (D-1) six colonos by deeds, designating the *batey* as the delivery point and with contract-letters without the agency clause of the Porto Rico Railroad Co.; (E) Eight contract-letters with delivery made by trucks and through sidetracks, including the clause relating to the Porto Rico Railroad Co., and (F) four hundred one colonos who did not sign any kind of contract, out of a total of one thousand seventy-five (1,075) * colonos during the grinding seasons of 1954, 1955 and 1956. (See Exh. C. of Central Guánica, Oct. 8, 1957.)

"But notwithstanding all these contracts designating the Central's *batey* as delivery point, all the colonos who testified at the hearings, before the Board testified the same, that is, that in the grinding seasons of 1954, 1955 and 1956, each one of them, continued delivering their canes at the same place that they had delivered them previously, that is, at the sidetracks, where, from time immemorial, the public or private railway had received the cane to transport them to the Central; others, those whose deliveries were not made at the sidetracks

---

*per grinding season

but at their own farms to the public or private railway, stated that they had continued to deliver their cane at the same place, but that for the grinding seasons of 1954, 1955 and 1956, Central Guánica did not pay to them the seven and one-half cents for each ton of cane delivered, to which they were entitled by law although it did pay the compensation for the grinding seasons of 1952 and 1953; and that they had no understanding, at any time, with the public railway for the transportation of those canes, that they never paid anything to the railroad, nor did they control the movement of the railroad cars; that they gave notice, as in years before, to the colonos' inspector or to the Central, when they were going to cut and deliver the canes, that if they had signed any contract, they were never told that the Central was going to act as their agent in transporting the colonos' canes by the public railway and Guánica did not pay them for transporting the canes to the sidetracks nor the hauling in their farms during the grinding seasons of 1954, 1955 and 1956 as it had done during the grinding seasons of 1952 and 1953, complying with the Board's Order dated September 20, 1957.

"It was further stipulated by counsel for Central Guánica and the Board's Legal Advisor, that all the colonos who had been present and all other colonos of Central Guánica, in the same condition as the latter, that is, who had signed a contract-letter to the effect that the point of delivery from the grinding season of 1954 to 1956 would be the *batey* of the Central, and were adversely affected by such designation, would testify the same as the colonos who took the witness stand at the hearing held that day, June 4, 1957, provided, however, that there is a group of colonos who would benefit from the designation of the *batey* as the point of delivery instead of the sidetrack."

Based on these findings, the Board determined, as a matter of law, that the colonos delivered their cane to the Central at the sidetracks "notwithstanding the fact that the Central had designated the *batey* of the mill as the delivery point in the contract-letters." It ordered, therefore, that the Central make the proper payments for hauling and transportation and hoisting services, considering the sidetracks and not the *batey* as the point of delivery. It relied on the

provisions of the Act and on *Eastern Sugar Associates* v. *Sugar Board*, 77 P.R.R. 354 (1954).

■ The petitioner maintains that the facts established by the Board are not supported by the evidence and that the evidence shows that the point of delivery was the mill's *batey*. We shall not stop on this point. It suffices to say that we have carefully examined the voluminous oral and documentary evidence appearing in record, and it fully supports the Board's findings. Every witness, without exception, and including some high executives of the petitioner, stated repeatedly and invariably, that the whole procedure used for the delivery of the canes during the grinding seasons of 1954, 1955 and 1956, was exactly the same as the one used for many decades, by the parties, including the transfer and delivery of the canes at the sidetracks.

■ The petitioner argues, however, that by virtue of several letters sent to a number of colonos, it designated the Central's *batey* as the delivery point and also became the "colono's agent" in regards to all the necessary agreements with the railroad and to pay "at the expense of the colono" the corresponding freight. Therefore, it adds, the petitioner's actions at the sidetracks during the years 1954–1956, even though identical to prior years, were performed as an agent of the colonos.

The petitioner's contentions compel us to summarize the principles laid down in *Eastern Sugar Associates* v. *Sugar Board, supra,* opinion of Mr. Chief Justice Snyder, after a full and elaborate discussion of the problem. In that suit, the sugar mill had also sent letters to the colonos designating the mill as the delivery place, but, as in the present case, it had made all the physical and legal agreements for delivery at an intermediate point. We acknowledged: 1. the Central's right, under § 6, to designate its mill as the delivery place and designate other delivery points in addition to the mill; 2. that there is nothing in § 6 requiring that the

delivery point also be the place where the cane is weighed; 3. that said section does not require any formal designation of point of delivery, either in writing or orally, and that the conduct of the parties is sufficient in order to make the terms of § 6 applicable; 4. that "By the same token a designation by a letter of a point of delivery contrary to the facts has no legal effect. Under § 6 what the parties do, not what they say, is controlling."; 5. that even assuming that a contract was made by virtue of the letters, it would be void because it is in conflict with § 6; and 6. that under the aforesaid section the mill is required to furnish free hoisting services and the necessary personnel at the delivery points.

In the case at bar, unlike the *Eastern* case, the letters sent to the colonos did not specify that the mill would take physical possession of the canes at the sidetracks to transport them later, on its own account, to the mill. They stated, as we have noted, that the delivery point would be the mill, and others added that the Central would act as the colonos' agent to make the necessary arrangements with the railroad with regard to the transportation of the canes from the sidetracks to the mill. Nevertheless, in view of all the other findings, that difference is not essential.

The evidence showed,[2] beyond any doubt, that the petitioner sent those letters to its colonos without any oral or written explanation whatsoever; that the colonos received them as part of all the papers they receive every day from the central; that some signed them without reading them, others without understanding them and others simply based on the relationship of trust or, better still, paternalism that existed between them and the agents of the central; that they never had the least notion that the signing of those letters would mean a reduction in their income for transportation

---

[2] This evidence covers only the case of several colonos, but it will be remembered that the parties stipulated that all colonos adversely affected would testify the same.

and hauling; that thereafter the delivery and transportation operations were carried out in the same manner as previously and the colonos did not intervene in the railroad operations; that it was later, at the time of the liquidation of transportation and hauling that they learned that those documents, which apparently seemed rutinary and innocent, had established a change in the place of delivery and had created an agency relationship between them and the central, whereby the latter could negotiate with the railroad on their behalf; and that they would have refused to accept such transaction and would have changed the grinding of their canes to another mill, if they had entertained the least suspicion that they would be paid less than in previous years.

It is obvious that neither the Sugar Board nor this Court will allow the use of any legal fiction, no matter how wise or ingenious it may appear at first sight, to destroy the rights granted by law to the colonos, nor the equitable principle that should prevail in the relationship between the parties. The mills have, undoubtedly, the perfect right to designate the points of delivery. But under particular circumstances,[3] the colonos have in turn the right to object to a change and to appeal to the Board in order that the latter may determine the point of delivery, and still of more significance, they have the right, guaranteed by § 3 of the Sugar Act (5 L.P.R.A. § 372), to make all the arrangements with the mill to grind their cane wherever it might be most advantageous to them.

From a proper adjustment of those rights and from the experience acquired in the *Eastern* case and in the present there arises in a concrete manner the need that whenever the central makes any change in the places of delivery it must duly inform its colonos the legal consequences of such change, and, above all, the economic consequences that it will entail, and thus make sure that their consent is not

---

[3] Section 6(*a*) of the Sugar Act.

the result of ignorance, routine or their trust in that all will continue the same. And the change, of course, should actually take place and not merely to screen a legal sham. The Sugar Board has not only the power, but the obligation, to investigate these situations and lend the necessary protection to all parties.[4]

The order of the Sugar Board will be affirmed with costs and expenses on the petitioner pursuant to § 33 (5 L.P.R.A. § 402) of the Sugar Act.

---

[4] The aforesaid principles govern also the case of La Reparada Development Co. We are convinced, as was the Board, that the petition of La Reparada to the mill to act directly with the railroad company, was based exclusively on its intention to gradually recover the sum of about $20,000 that the railroad owed it and in no way to make a change in the transportation and hauling system which would cost it $4,000 yearly. This testimony was not controverted by the witnesses of the petitioner and the evidence showed also, that aside from the fact above explained as to the payment to the railroad, the transportation and hauling system continued operating under identical conditions as in previous grinding seasons.